**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| Skatteforvaltningen,<br><br>      Plaintiff,<br><br> vs.<br><br>470 South Ocean Boulevard Trust, Jonathan E. Gopman, *in his capacity as trustee for the 470 South Ocean Boulevard Trust*, and Quadrant Holdings Inc.,<br><br>      Defendants. | Civil Action No.:<br><br><br>**COMPLAINT** |

Plaintiff Skatteforvaltningen ("SKAT"), by its undersigned counsel, alleges against Defendants 470 South Ocean Boulevard Trust ("470 Trust"), Jonathan E. Gopman, in his capacity as trustee for the 470 Trust ("Gopman"), and Quadrant Holdings Inc. ("Quadrant") as follows:

1. Luke McGee is a judgment debtor who owes SKAT approximately $164 million for breaching a settlement agreement that resolved SKAT's civil claims against him.  To shield his assets from SKAT, McGee transferred approximately $30 million through the 470 Trust and into an 8,804-square foot, oceanfront townhouse located in Palm Beach, Florida (the "Palm Beach Mansion") to improperly exploit Florida's homestead exemption.  SKAT previously filed an action in this Court to recover those fraudulently transferred assets and enforce its then-anticipated approximately $164 million judgment against the Palm Beach Mansion (the "Homestead Action"), which action the 470 Trust and Gopman successfully argued should be heard in the United States District Court for the Southern District of New York (the "New York Court").  Now unsatisfied with their choice of venue, the 470 Trust and Gopman have recorded and sent SKAT a Notice of Homestead in a brazen effort to return the parties' dispute over the

Palm Beach Mansion back to Florida, their newly preferred forum.  SKAT brings this action in response to the 470 Trust and Gopman's serial forum shopping efforts and to preserve its rights with respect to the Palm Beach Mansion during the pendency of the Homestead Action pending before the New York Court.

2.      Between 2012 and 2015, McGee and his co-conspirators, Matthew Stein ("Stein") and Jerome Lhote ("Lhote"), perpetrated a sophisticated dividend withholding tax refund fraud against the Danish government, lining their pockets with tens of millions of dollars of fraudulent proceeds.  In or about August 2015, McGee learned that SKAT was investigating the fraud and subsequently learned of a parallel criminal investigation by the Danish Public Prosecutor for Serious Economic and International Crime ("SØIK").  After the scheme unraveled, McGee and his co-conspirators postured as if they would repay the stolen funds to avoid a publicly filed civil lawsuit accusing them of wrongdoing and in the hope that it would forestall criminal prosecution in Denmark.  In May 2019, McGee, Stein and Lhote executed a settlement agreement with SKAT (the "Settlement Agreement") and committed to repay their net proceeds of the fraud.  That promise proved hollow once Danish prosecutors charged and indicted McGee, Stein and Lhote in April 2021.  McGee, Stein, and Lhote's criminal trial in Denmark was set to commence on June 2, 2026.  Upon information and belief, McGee failed to appear for trial despite agreeing to do so, and an international warrant was issued for his arrest.

3.      In March 2023, Stein and Lhote sued SKAT in the New York Court (the "Maple Point Action"), seeking to evade their remaining obligations to SKAT under the Settlement Agreement.  SKAT asserted counterclaims against Stein and Lhote, to which it joined McGee, alleging multiple breaches of the Settlement Agreement and seeking to recover approximately $164 million owed to SKAT thereunder.

4.      On September 22, 2025, following a bench trial in the Maple Point Action, the New York Court found in SKAT's favor on all counts and held McGee, Stein, and Lhote jointly and severally liable for approximately DKK 1 billion.  On October 9, 2025, the Clerk of Court entered judgment in SKAT's favor in the amount of approximately $164 million (the "Judgment").

5.      McGee never intended to fully satisfy his obligation to SKAT under the Settlement Agreement.  Instead, after learning of the Danish government's civil and criminal investigations into the fraud, McGee began surreptitiously sheltering his assets to render himself judgment-proof and to frustrate SKAT's ability to recover the amounts that McGee owes.

6.      To conceal his assets and purportedly place them beyond SKAT's reach, McGee utilized various limited liability companies and trusts, including non-parties Fresh Pond Investment LLC ("Fresh Pond"), 2321 Capital LLC ("2321 Capital"), LBM DME Holdings LLC ("LBM DME Holdings"), and the LBM Family Trust.  On September 3, 2021—after having been indicted in Denmark and while owing SKAT over DKK 600 million (approximately $93.1 million at the current exchange rate) under the Settlement Agreement—McGee established the 470 Trust.  Through the 470 Trust, McGee transferred approximately $30 million to purchase the Palm Beach Mansion to take improper advantage of Florida's homestead exemption.  McGee admits that he moved to Florida, in part, because of the State's favorable asset protection laws and his payment obligation to SKAT under the Settlement Agreement.

7.      SKAT's investigation to date reveals that, apart from the tens of millions of dollars in ill-gotten proceeds that McGee and his co-conspirators obtained through their fraud on the Danish government, McGee's wealth largely derives from AdaptHealth Corp., a home medical equipment business that he took public in 2019.  In 2014—while defrauding SKAT—

McGee began serving as an officer of QMES LLC, which later changed its name to AdaptHealth LLC. AdaptHealth LLC was a wholly owned subsidiary of AdaptHealth Holdings, LLC.

8.      Prior to July 2019, McGee began negotiations with DFB Healthcare Acquisitions Corp. ("DFB"), a special purpose acquisition company, about taking his medical equipment business public. Upon information and belief, during those negotiations, McGee did not inform DFB about his fraud on SKAT or the Danish government's resulting investigations. In November 2019, McGee and DFB took the company public when AdaptHealth Holdings, LLC and other entities merged with DFB, which changed its name to AdaptHealth Corp. and began trading publicly. As a result of the merger, McGee became the Chief Executive Officer and a Director of AdaptHealth Corp. and received substantial compensation, approximately $30 million of which McGee subsequently funneled into the Palm Beach Mansion. Upon information and belief, had McGee disclosed his involvement in the massive fraud on SKAT and the Danish government's resulting investigations, DFB would not have agreed to take AdaptHealth Corp. public with McGee given the prospect that McGee's fraudulent background would adversely affect AdaptHealth Corp. McGee did not disclose the investigations because he knew that if he did, DFB would not have agreed to take AdaptHealth Corp. public. McGee's actions with respect to DFB, AdaptHealth Corp., and its shareholders was fraud.

9.      The negative impact of McGee's decision to withhold information concerning his involvement in the Danish fraud and the resulting investigations eventually came to bear. On April 13, 2021, AdaptHealth Corp. announced that it had put McGee on unpaid leave because it had "learned that authorities from Denmark [had] formally charged [him] with alleged tax fraud arising from certain past private activity." AdaptHealth Corp.'s stock dropped approximately 20% on this news as analysts noted the loss of a "visionary" responsible for AdaptHealth Corp's

success.  The stock dropped even though AdapthHealth Corp.'s release emphasized that "[t]he alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business."  McGee ultimately resigned from his position at AdaptHealth Corp.

10.     McGee's purchase of the Palm Beach Mansion through the 470 Trust with his ill-gotten gains from AdaptHealth Corp. is, to SKAT's knowledge, just one of his various efforts to render himself judgment-proof and keep his assets beyond the reach of SKAT.  As part of his efforts, McGee claims to have recently "borrowed" $3.75 million from Quadrant Management LLC—a Quadrant affiliate that McGee has close ties to—to place a purported lien on the Palm Beach Mansion.  This was done to prevent SKAT from recovering the full amount used to purchase the Palm Beach Mansion and, as discussed below, to manufacture venue with respect to the parties' dispute over the applicability of Florida's homestead protections to the Palm Beach Mansion.

11.     McGee cannot be permitted to shelter his substantial assets from SKAT and avoid his obligations under the Judgment, specifically with respect to the Palm Beach Mansion given that Florida's homestead protection does not protect funds transferred into a homestead when those funds were derived from fraud or egregious conduct.  SKAT previously brought the Homestead Action in this Court to, among other things, avoid McGee's transfer of approximately $30 million through the 470 Trust to purchase the Palm Beach Mansion, to impose an equitable lien on the Palm Beach Mansion, and to enjoin further disposition of the approximately $30 million transferred to the 470 Trust and the Palm Beach Mansion.  In seeking dismissal of the Homestead Action, the 470 Trust and Gopman argued that venue was improper and that SKAT should have brought the Homestead Action in the New York Court.  This Court agreed and, in the interests of justice, transferred the Homestead Action to the New York Court,

where it remains pending.  The 470 Trust and Gopman have raised Florida's homestead exemption as a defense in that case.

12.     Since the transfer of the Homestead Action to the New York Court, SKAT has obtained the approximately $164 million Judgment against McGee in the Maple Point Action.  Since then, the 470 Trust and Gopman, in a transparent attempt at forum shopping, have sought to retransfer the Homestead Action back to this Court.  Sensing that those efforts may fail, the 470 Trust and Gopman recorded and sent to SKAT a Notice of Homestead, in which they claimed the Palm Beach Mansion as exempt under Florida's homestead protections, that the 470 Trust would provide a mortgage over the Palm Beach Mansion based on a $3.75 million loan from Quadrant, and that, pursuant to Section 222 of the Florida Statutes, SKAT was required to commence a declaratory judgment action in Florida to determine the Palm Beach Mansion's homestead status by June 15, 2026.

13.     Whether Florida's homestead exemption protects the Palm Beach Mansion from SKAT will be decided by the New York Court in the Homestead Action, as requested by the 470 Trust and Gopman.  To preserve its rights, SKAT now brings the instant claims for a declaratory judgment against the 470 Trust, Gopman, and Quadrant declaring, as SKAT anticipates the New York Court will do, that Florida's homestead exemption does not protect the Palm Beach Mansion from SKAT because McGee purchased it with the proceeds of fraud or egregious conduct, and that, accordingly, SKAT's judgment lien, and any equitable lien obtained in the Homestead Action, is superior to Quadrant's purported lien.  SKAT, however, intends to move to stay this action to permit the New York Court to consider and resolve these issues.

## PARTIES

14.     Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes.  SKAT is located at Hannemanns Allé 25, DK.2300 Copenhagen, Denmark.

15.     Defendant 470 South Ocean Boulevard Trust is a trust that was formed on September 3, 2021 under Florida law.  On September 4, 2021, McGee, through the 470 Trust, purchased an 8,804-square foot townhouse located at 470 S. Ocean Boulevard in Palm Beach, Florida for approximately $29.6 million.  McGee and his wife, Gabrielle McGee, are beneficiaries of the 470 Trust as tenants by the entirety, a purported property interest established as a result of McGee's fraudulent transfers.

16.     Defendant Jonathan E. Gopman is the trustee of the 470 Trust.  Gopman is a partner at the law firm Nelson Mullins LLP and specializes in private wealth services, including asset protection structures.  Upon information and belief, Gopman is a citizen of the United States and a citizen of Florida.

17.     Defendant Quadrant Holdings Inc. is a Delaware corporation and maintains its principal place of business in New York.

## JURISDICTION

18.     The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(4) because the amount in controversy exceeds $75,000, exclusive of interest or costs, and it is between a political subdivision of a foreign state, as plaintiff, and citizens of U.S. states, as defendants.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District and a substantial part of the property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS

**McGee's fraud on SKAT**

20.     From 2012 to 2015, McGee, Stein and Lhote engaged in a massive fraud on SKAT that involved U.S. pension plans submitting claims for refunds of taxes supposedly withheld at source from dividends that Danish companies issued to their shareholders.

21.     Between 2012 and 2013, Stein and Lhote used Solo Capital Partners—a prime brokerage owned by Sanjay Shah—as the purported custodian for their pension plans.  Solo Capital generated "dividend credit advices" falsely representing that the plans owned Danish shares, received dividends on those shares, and suffered withholding taxes on the dividends.  The pension plans submitted those dividend credit advices to SKAT to support their fraudulent tax refund claims.  Stein and Lhote's two primary business partners in this phase of the scheme conceded at a trial in the Southern District of New York that the pension plans did not actually purchase any shares or receive any dividends, and thus the refund claims were all false.  As part of his fraud, McGee used 2321 Capital to sponsor a pension plan that submitted fraudulent reclaims to SKAT.

22.     In late 2013 or early 2014, Stein and Lhote split from the Solo Capital scheme and, along with McGee, acquired North Channel Bank in Germany, which they used as purported custodian for their pension plans to generate additional false dividend credit advices to submit to SKAT.

23.     From 2014 through August 2015, they used a new, larger group of pension plans to submit the false tax refund claims to SKAT.

24.     Over the course of the fraud, McGee and his co-conspirators defrauded SKAT of approximately DKK 2.9 billion (approximately $450 million at the current exchange rate) in purported refunds for taxes never paid or owed.

**McGee learns of investigations into the fraud**
**and enters the Settlement Agreement with SKAT**

25.     In summer 2015, the U.K. government alerted SKAT to the fraud, prompting SKAT to halt all dividend withholding tax refund payments.

26.     In August 2015, McGee learned from news reports that SKAT was investigating the fraud, and subsequently learned about a parallel criminal investigation by SØIK.

27.     By 2017, aware of those civil and criminal investigations, McGee, Stein and Lhote approached SKAT to negotiate a settlement.  Discussions continued through the end of 2018 and early 2019, at which point SKAT made clear that, despite McGee's, Stein's and Lhote's request, it would not condition a settlement on immunity from potential criminal charges in Denmark.

28.     On May 28, 2019, McGee, Stein, Lhote and others executed the Settlement Agreement, resolving SKAT's civil claims against them regarding the fraud.

29.     Under the Settlement Agreement, McGee, Stein and Lhote agreed jointly and severally to repay SKAT the "net proceeds" received from SKAT's payment of their fraudulent refund applications.  The Settlement Agreement established a preliminary settlement amount of DKK 1.55 billion, subject to increase if the net proceeds were, in fact, more than that amount.

30.     McGee, Stein, Lhote and other settling parties paid DKK 950 million of the preliminary settlement amount.  McGee, Stein and Lhote were required to pay the remaining DKK 600 million, plus a true-up amount, by May 28, 2023.

**McGee and his co-conspirators are indicted in Denmark**

31.     In September 2019, North Channel Bank (owned by McGee, Stein and Lhote), pled guilty in Denmark to serious criminal fraud for its role in creating the false dividend credit advices.

32.     McGee, aware since 2017 of SØIK's criminal investigation into the fraud, was preliminarily charged in June 2020 and indicted in April 2021.  Stein and Lhote were indicted along with McGee in April 2021.  Stein, Lhote and McGee's criminal trial was due to commence in Denmark on June 2, 2026.  Upon information and belief, McGee failed to appear for trial despite agreeing to do so, and an international warrant was issued for his arrest.

**McGee defrauds DFB/AdaptHealth Corp.**

33.     In or around 2014—while defrauding SKAT—McGee began serving as an officer for QMES LLC, a home medical equipment business.  Ultimately, QMES LLC changed its name to AdaptHealth LLC.  AdaptHealth LLC was a wholly owned subsidiary of AdaptHealth Holdings, LLC.

34.     Prior to July 2019, McGee began negotiations with DFB, a special purpose acquisition company, about taking his medical equipment business public.  Upon information and belief, during those negotiations, McGee did not inform DFB about his fraud on SKAT or the Danish government's resulting investigations, which constituted a material omission of fact. In November 2019, McGee and DFB brought the company public when AdaptHealth Holdings, LLC and other entities merged with DFB, which changed its name to AdaptHealth Corp. and

began trading publicly.

35.     As a result of the merger, McGee became the Chief Executive Officer and a Director of AdaptHealth Corp. and received substantial compensation, $30 million of which McGee subsequently funneled into the Palm Beach Mansion.  Upon information and belief, had McGee disclosed his involvement in the massive fraud on SKAT and the Danish government's resulting investigations, DFB would not have agreed to take AdaptHealth Corp. public with McGee given the prospect that McGee's involvement in the massive fraud on SKAT and the Danish government's resulting criminal investigations would negatively impact AdaptHealth Corp.  McGee did not disclose the investigations because he knew that if he did, DFB would not have agreed to take AdaptHealth Corp. public.

36.     The negative impact of McGee's decision to withhold information concerning his involvement in the Danish fraud and the resulting investigations eventually came to bear.  On April 13, 2021, AdaptHealth Corp. announced that it had put McGee on unpaid leave because it had "learned that authorities from Denmark [had] formally charged [him] with alleged tax fraud arising from certain past private activity."  AdaptHealth Corp.'s stock dropped approximately 20% on this news as analysts noted the loss of a "visionary" responsible for AdaptHealth Corp's success.  The stock dropped even though AdapthHealth Corp.'s release emphasized that "[t]he alleged personal conduct occurred between March 2014 and August 2015 and had no connection to AdaptHealth's business."  McGee ultimately resigned from his position at AdaptHealth Corp.

37.     McGee's failure to disclose his involvement in the Danish fraud and the resulting investigations to DFB/AdaptHealth Corp. resulted in a class action lawsuit in the United States District Court for the Eastern District of Pennsylvania against McGee, AdaptHealth Corp., and other officers and directors of AdaptHealth Corp., pursuant to the Securities Act of 1933, 15

-11-

U.S.C. §§ 77a, *et seq.*, and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78A, *et. seq.  See Del. Cnty. Emps. Ret. Sys. v. AdaptHealth Corp.*, No. 21-3382, ECF No. 1, (E.D. Pa July 29, 2021).

**McGee breaches the Settlement**
**Agreement and is found liable following trial**

38.     As noted above, McGee, Stein and Lhote's remaining payment obligation under the Settlement Agreement was due by May 28, 2023.

39.     On March 24, 2023, instead of meeting their obligation to SKAT, Stein and Lhote commenced the Maple Point Action.  SKAT asserted counterclaims against Stein and Lhote, to which it joined McGee, alleging that they breached the Settlement Agreement and seeking to recover over DKK 1 billion owed to SKAT thereunder.

40.     On September 22, 2025, following a bench trial in the Maple Point Action, the New York Court found in favor of SKAT on all counts and held that judgment should be entered for SKAT on its breach of contract counterclaims against McGee, Stein and Lhote, jointly and severally, in the amount of approximately DKK 1 billion.

41.     On October 9, 2025, the Clerk of Court entered the Judgment in SKAT's favor in the amount of approximately $164 million.

42.     McGee's actions prior to commencement of the Maple Point Action reveal that McGee never intended to honor his obligation to SKAT under the Settlement Agreement. Rather, in the time leading to the Maple Point Action, McGee took affirmative steps to shield his assets and become judgment proof to stymie SKAT's ability to enforce the Settlement Agreement and any judgment against him.  As part of those steps, McGee directly or indirectly transferred into Fresh Pond, 2321 Capital, LBM DME Holdings LLC, and the LBM Family Trust cash and his equity interests in AdaptHealth Corp.'s predecessor entities that ultimately

converted into AdaptHealth Corp. shares.  The ultimate beneficiary of those transfers is Gabrielle McGee, McGee's wife, who, before the transfers, did not own a single share of AdaptHealth Corp. or any interest in its predecessor entities.  As a result of the transfers, much of McGee's wealth now sits with his wife, ostensibly beyond SKAT's reach.  Upon information and belief, McGee exercises domination and control over Fresh Pond, 2321 Capital, LBM DME Holdings LLC, and the LBM Family Trust to the point that they no longer have legal or independent significance of their own.  Upon information and belief, Fresh Pond, 2321 Capital, LBM DME Holdings LLC, and the LBM Family Trust are shams and exist for no other purpose than as vehicles to fraudulently convey assets away from McGee to defraud his creditors.

43.     As part of these asset protection efforts, McGee established the 470 Trust as a vehicle to transfer a large chunk of his ill-gotten assets into the Palm Beach Mansion and in an attempt to shield them from SKAT's reach.  The Palm Beach Mansion—an 8,804-square foot oceanfront townhouse located at 470 S. Ocean Boulevard in Palm Beach, Florida—was purchased with approximately $29.6 million of McGee's earnings from AdaptHealth Corp., which, upon information and belief, he would not have obtained had he disclosed to DFB and/or AdaptHealth Corp. his fraud on SKAT or the Danish government's subsequently investigations. To facilitate the purchase of the Palm Beach Mansion, McGee, with these ill-gotten assets, either funded the 470 Trust to purchase the Palm Beach Mansion or purchased the Palm Beach Mansion and transferred it to the 470 Trust.

44.     The 470 Trust's purchase of the Palm Beach Mansion was intended to take advantage of the Florida homestead exemption for McGee and his wife's benefit, as McGee admits that he moved to Florida, in part, because of the State's favorable asset protection laws and his payment obligation to SKAT under the Settlement Agreement.

45. Following the purchase of the Palm Beach Mansion, McGee obtained possession of the Palm Beach Mansion, used the Palm Beach Mansion as his address to register for several licenses, and personally paid property taxes for the Palm Beach Mansion in November 2021 and 2022. McGee's wife, Gabrielle McGee, paid property taxes for the Palm Beach Mansion in December 2023.

46. McGee's purchase of the Palm Beach Mansion was done to prevent SKAT from obtaining funds owed by McGee under the Settlement Agreement.

47. McGee did not receive a reasonably equivalent value in exchange for the transfer.

48. Upon information and belief, McGee became insolvent as a result of the transfer of funds for the purchase of the Palm Beach Mansion held by the 470 Trust or was already insolvent at the time of the transfer.

49. McGee has insufficient assets to satisfy his joint and several obligation to SKAT.

50. McGee exercises domination and control over the 470 Trust to the point that it no longer has legal or independent significance of its own. The 470 Trust is a sham and exists for no other purpose than as vehicle to hold McGee's fraudulently transferred assets.

**The Homestead Action**

51. On July 9, 2024, SKAT commenced the Homestead Action in this Court, seeking, among other things, to avoid McGee's transfer of approximately $30 million to the 470 Trust to purchase the Palm Beach Mansion.

52. On September 20, 2024, the 470 Trust and Gopman moved to dismiss, arguing, among other things, that SKAT's claims are barred by Florida's homestead exemption and that venue in this Court was improper under the Settlement Agreement's forum-selection clause. On February 21, 2025, this Court granted the 470 Trust and Gopman's motion solely on venue

grounds and ordered the case transferred to the New York Court.

53.     The Homestead Action remains pending in the New York Court.  After SKAT obtained the approximately $164 million Judgment in the Maple Point Action, and in an transparent attempt at forum shopping, the 470 Trust and Gopman moved to retransfer the Homestead Action back to this Court.  That motion remains pending.

**The Notice of Homestead**

54.     On May 5, 2026, the 470 Trust and Gopman's counsel provided SKAT a Notice of Homestead, in which Gopman claimed the Palm Beach Mansion as a homestead exempt from levy and execution.  In the Notice of Homestead, Gopman explained that Quadrant—an entity closely tied to McGee—would receive a mortgage over the Palm Beach Mansion based on a $3.75 million loan, which transaction was set to close on April 30, 2026.

55.     Gopman further certified that the Judgment, which SKAT had filed a certified copy of in Palm Beach County, Florida, purportedly does not constitute a valid lien on the Palm Beach Mansion and that, pursuant to Section 222 of the Florida Statutes, SKAT was required to commence the instant action within 45 days after the mailing of the Notice of Homestead, lest Quadrant or any buyer take the Palm Beach Mansion free and clear of SKAT's judgment lien.

56.     It is clear that the Notice of Homestead is part of the 470 Trust and Gopman's efforts to deprive the New York Court of jurisdiction to resolve the homestead issue at the heart of the Homestead Action and to continue to frustrate SKAT's ability to enforce its Judgment.

## CAUSES OF ACTION

## COUNT I

**(Declaratory Judgment)**
**(Against all Defendants)**

57.     SKAT repeats and realleges paragraphs 1 through 56 above as if fully set forth herein.

58.     An actual, substantial controversy exists between the parties as to whether Florida's homestead exemption protects the Palm Beach Mansion from the enforcement of SKAT's Judgment and whether Quadrant's purported lien has priority over SKAT's judgment lien and its anticipated equitable lien.

59.     SKAT, on one hand, and Defendants, on the other hand, have adverse legal interests with respect to this controversy.

60.     The controversy between the parties is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

61.     As a result of the foregoing, SKAT is entitled to a declaratory judgment against Defendants declaring that (1) Florida's homestead exemption does not protect the Palm Beach Mansion from the enforcement of SKAT's Judgment because it was purchased with the proceeds of fraud or egregious conduct and, therefore, SKAT is entitled to an equitable lien on the Palm Beach Mansion; and (2) SKAT's judgment lien and its anticipated equitable lien on the Palm Beach Mansion have priority over Quadrant's purported lien.

## REQUEST FOR RELIEF

62.     WHEREFORE, Plaintiff SKAT requests that this Court enter judgment in its favor against Defendants as follows:

63.     For Count I:

    a.  A declaration that that (1) Florida's homestead exemption does not protect the Palm Beach Mansion from the enforcement of SKAT's Judgment because it was purchased with the proceeds of fraud or egregious conduct and, therefore, SKAT is entitled to an equitable lien on the Palm Beach Mansion; and (2) SKAT's judgment lien and its anticipated equitable lien on the Palm Beach Mansion have priority over Quadrant's purported lien.

64.     The costs of this action.

65.     All other and further relief that is just and proper.

## JURY TRIAL DEMAND

Skatteforvaltningen demands a trial by jury on all issues so triable.

Dated: Miami, Florida
      June 15, 2026

Respectfully submitted,

HUGHES HUBBARD & REED LLP

By: _____
Daniel H. Weiner
Fla. Bar No. 71112
201 South Biscayne Boulevard
Miami, Florida 33131-4332
(305) 358-1666 (t)
(305) 371-8759 (f)

*Counsel for Plaintiff Skatteforvaltningen*
*(Customs and Tax Administration of the*
*Kingdom of Denmark)*